UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                              :
VIVIAN FREEMAN,               :
                              :
         Plaintiff,           :      HONORABLE JOSEPH E. IRENAS
                              :      CIVIL ACTION NO. 07-1519 (JEI/JS)
     v.                       :
                              :            OPINION
MICHAEL CHERTOFF,             :
SECRETARY, DEPARTMENT OF      :
HOMELAND SECURITY,            :
                              :
         Defendant.           :
```

**APPEARANCES:**

LAW OFFICES OF DENNIS L. FRIEDMAN
1515 Market Street, Suite 1000
Philadelphia, PA 19102
         Counsel for Plaintiff

RALPH MARRA, Acting United States Attorney
By:  Peter O'Malley, A.U.S.A.
     Anthony J. Labruna, Jr., A.U.S.A.
970 Broad Street, Suite 700
Newark, New Jersey 07102
         Counsel for Defendant

**IRENAS**, Senior District Judge:

Plaintiff, Vivian Freeman ("Freeman"), a former Security
Assistant with the Federal Air Marshal Service, brings this
Rehabilitation Act, 29 U.S.C. § 701, et seq., disability
discrimination / retaliation suit against her former employer,
the Department of Homeland Security ("the government").  Freeman
asserts that she suffered discrimination on account of her
disability, and retaliation for pursuing her EEO remedies in

connection with the alleged discrimination.  The government moves
to dismiss, or alternatively, for summary judgment.  For the
reasons stated herein, the government's motion will be denied.


                              **I.**

    Freeman was employed by the government as a Security
Assistant at the Federal Air Marshal Service Philadelphia field
office[1] from October, 2002 to February, 2005.  Insofar as
relevant to the instant case, Freeman's duties as a Security
Assistant mainly consisted of prviding administrative support to
Federal Air Marshals ("FAMs").  (Def. Ex. 1)  Among other things,
Freeman made flight reservations; helped FAMs apply for passports
and visas; tracked information impacting the travel budget for
the Philadelphia field office; maintained, reviewed, and input
time and attendance reports for payroll purposes; and prepared
and reviewed FAMs' travel authorizations, vouchers, and
supporting documentation.  (Id.)  Of these duties, payroll and
travel voucher processing filled approximately 80-90% of a
Security Assistant's time in a given week (payroll taking
approximately 40-50% of the time; and vouchers taking 40%).  (Pl.
Ex. Q[2] at p. 16, 28, 144)  During the relevant time period, there

--------------------------------------

    [1]  Despite its name, the FAMS Philadelphia field office was actually
located in Mays Landing, New Jersey during the relevant time period.

    [2]  Plaintiff's Exhibit Q is the transcript of the hearing before the
administrative law judge for the Merit Systems Protection Board.

were two other people in the Philadelphia field office holding the same position as Freeman.  (Pl. Ex. Q at p. 16, 142)

On April 25, 2003, Freeman, who uses a wheelchair, injured herself when she lost control of her wheelchair on an access ramp, suffering an "incomplete / partial rotator cuff tear of her right shoulder." (Def. Ex. 3)[3]  While Freeman was on leave recovering from her injury, she was also involved in a car accident, although it is not clear whether, or to what extent, she was injured in that accident.  Freeman finally returned to work in late July, 2003, with a three-day-a-week work schedule in accordance with her physician's recommendation that she not return to her position full-time.  (Id.)[4]  The government allowed Freeman to work three days a week from July, 2003 to June, 2004, but Freeman was required to take leave without pay for the two days a week she did not work. (Def. Ex. 4; Pl. Ex. Q at p. 388)

Freeman repeatedly inquired verbally about teleworking from home for the two days a week she could not come to the office so that she could maintain her full-time pay.  (Pl. Ex. Q at p. 402-03)  According to Freeman, such an arrangement would still be

---

[3]  The record does not indicate what condition caused Freeman to be wheelchair-bound in the first place, and it is not clear whether that condition affected the severity of her injuries or the length of her recovery. Freeman was in her mid-50s at the time of the accident.  She began receiving Social Security Disability benefits in 1979.  She testified she became wheelchair bound in 2000.  (Pl. Ex. Q at p. 384)

[4]  Freeman's physician also recommended "no lifting," "no standing," and no "repetitive motion of the upper extremities" (Def. Ex. 3), although nothing in the record suggests that Freeman's job required lifting, standing, or such repetitive motion.

consistent with her medical restrictions because her physicians'
concern was the fatigue caused by commuting to and from work five
days a week.  (Id. at 386)[5]  Her supervisors, however, always
refused her requests, stating that they had no telework policy in
place.  (Id. at 402-03)[6]

From mid-June, 2004, until August, 2004, Freeman took
another medical leave of absence for a cardiac catherization.
(Pl. Ex. Q at 406; Def. Ex. 3)  She returned to her three-day a
week schedule in August, 2004, and again asked about teleworking
(Id. at 406; Def. Ex. 3), but to no avail.  According to Freeman,
her supervisors simply "wouldn't entertain the telework idea."
(Pl. Ex. Q at p. 419)

In a letter dated September 1, 2004, Freeman, through her
attorney, formally requested to telework from home two days a
week. (Pl. Ex. A)  The letter further stated,

> I am troubled by the agency's callous treatment if Ms.
> Freeman, which I perceive may be motivated by
> impermissible discrimination.  Specifically, it
> appears that the agency may be discriminating against
> Ms. Freeman as an individual with a disability.  I

---

[5]  The record evidence conflicts as to whether Freeman's physicians
determined that Freeman could work full-time as opposed to part-time,
regardless of her commuting arrangements.  For the purposes of summary
judgment, the Court construes the evidence in the light most favorable to
Freeman and will assume that Freeman was able to work full-time if she was not
required to commute all five working days.

[6]  Freeman also inquired about a promotion as another way to ameliorate
the financial difficulties that resulted from her part-time work.  (Pl. Ex. Q
at p. 431)  According to Freeman, her supervisor, Tom Spurlock, advised her
that "he knew the good job [she] was doing" and the "only thing holding back
[her] promotion was . . . that . . . [she] had been out so much."  (Id. at p.
413)

> have recommended to Ms. Freeman that she seek
> counseling with an EEO counselor, in order to preserve
> her rights in the event that management does not take
> the appropriate actions to rectify the situations.

(Id.)

The record contains no response to the September 1, 2004

letter, despite a follow-up letter from Freeman's attorney,

requesting a response.  (Pl. Ex. B)

Then in a letter dated October 18, 2004, Spurlock formally

notified Freeman that he proposed to "remove" her from her

position for "non-disciplinary" reasons.  (Pl. Ex. D)  The letter

explained,

> The reason for this [proposed] action is your inability
> to perform the essential functions of your position as a
> Security Assistant.
>      You were hired on October 6, 2002, to occupy a full
> time position of Security Assistant . . . . You performed
> those duties on a full time basis through April 28, 2003.
> Since that date you have been accommodated with regard to
> working a part time schedule . . .
>      . . . . Unfortunately this office can no longer
> accommodate your part time schedule.  The needs of this
> office require that your position be performed on a full
> time basis.
>      . . . [Y]our attorney . . . submitted a request that
> your medical condition be reasonably accommodated via a
> part-time [sic] telecommuting schedule. . . .
> Unfortunately, due to the sensitive nature of the
> documents you review, the short turn around time for the
> projects assigned to you, as well as the need for your
> work product to be closely monitored, a part-time [sic]
> telecommuting schedule is not possible. . . .

(Id.)

In accordance with agency procedures, Freeman, through her

attorney, submitted a written reply to her proposed removal,

asserting that the reasons given for the proposed action lacked factual support and the actual motivation was disability discrimination and retaliatory animus based on Freeman's prior EEO involvement.  (Pl. Ex. E)[7]  Apparently the parties also met in person to orally discuss the proposed removal.  (Pl. Ex. G, Pl. Ex. Q at p. 264)

On January 21, 2005, Louw-Shang Liu, Special Agent in Charge of the Philadelphia Field Office, wrote Freeman to advise her that he had suspended his deliberations regarding her removal to consider her request for accommodations.  (Pl. Ex. G)  The letter went on to deny the request because

> [Security assistants] are tasked with performing numerous clerical/support work assignments in the office. . . . Because FAMs have very little time in the office each week, it is very common that these FAMs have last minute issues that need to be resolved in a prompt and efficient manner.  Your absence from the office would greatly hamper your ability to provide the needed administrative support to these FAMs, and would negatively impact the other security assistants in the office who would invariably have to handle the emergent needs of the FAMs during your absence.
>
> . . . As a security assistant, you are required to work with and maintain files that contain sensitive personnel information.  For security and privacy reasons, this information cannot leave the Philadelphia [field] office.

---

[7]  Freeman had an initial interview with her EEO counselor on September 27, 2004.  (Pl. Ex. O)  On October 15, 2004, the EEO counselor spoke to Spurlock and Karen Jost about Freeman's discrimination allegations.  (Id.)  Freeman filed a formal EEO complaint on November 10, 2004.  (Pl. Ex. F)

(Id.)

Freeman, once again through her attorney, responded in writing to the January 21, 2005 letter, reiterating her position that the reasons given for denying her request were discriminatory and retaliatory.  (Pl. Ex. H)

Freeman was removed from her position, effective February 10, 2005.  Louw-Shiang Liu wrote,

> I have reviewed all the information presented and find the reason contained in the proposal to be sustained. . . . [Y]our position is a full time position, requiring your presence in the workplace.  While you asked to be allowed to work at home two days a week as an accommodation, your request does not promote the efficiency of the government.  In addition, the agency is unable to accommodate your continued part time schedule.

(Pl. Ex. I)

Freeman appealed the decision to the Merit Systems Protection Board.  After a hearing, the ALJ affirmed the decision to remove Freeman, and rejected Freeman's affirmative defenses of discrimination and retaliation.  Freeman's sought review of the ALJ's decision, but her petition for review was denied.

This suit followed.  The Complaint seeks this Court's review of the government's decision to remove Freeman, and asserts discrimination and retaliation claims pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.[8]  Freeman

---

[8]  The Court has subject matter jurisdiction over this mixed discrimination case originating before the Merit Systems Protection Board, pursuant to 5 U.S.C. § 7703(b)(2).  *See Kean v. Stone*, 926 F.2d 276 (3d Cir. 1991).

seeks retroactive reinstatement with back pay, compensatory
damages, costs, and attorneys fees.

## II.

This Court reviews the discrimination and retaliation claims
*de novo*; the decision to remove Freeman is reviewed on the
administrative record. *See Makky v. Chertoff*, 489 F. Supp. 2d
421, 428 (D.N.J. 2007) *aff'd by* 541 F.3d 205 (3d Cir. 2008).

"[S]ummary judgment is proper 'if the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and that the moving party
is entitled to a judgment as a matter of law.'" *Celotex Corp. v.
Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P.
56(c)).  In deciding a motion for summary judgment, the Court
must construe the facts and inferences in a light most favorable
to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*,
794 F.2d 860, 864 (3d Cir. 1986).  The role of the Court is not
"to weigh the evidence and determine the truth of the matter, but
to determine whether there is a genuine issue for trial."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

8

**III.**

A.   <u>Discrimination claim--failure to accommodate</u>[9]

Disability discrimination and retaliation claims under the Rehabilitation Act are analyzed using the same framework applied to claims under the Americans With Disabilities Act, 42 U.S.C. § 12101 et seq. *See* 29 U.S.C. § 794(d); *Disabled in Action v. SEPTA*, 539 F.3d 199, 207 n.11 (3d Cir. 2008) . Accordingly, "[a] disabled employee may establish a prima facie case [of disability discrimination] if she shows that she can perform the essential function[s] of the job with reasonable accommodation and that the employer refused to make such an accommodation." *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 610 (3d Cir. 2006). Freeman "must establish that she (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Id.* at 611.

(1)   *Disability*

The government asserts that the record evidence cannot support a finding that Freeman was disabled. The Rehabilitation Act defines "individual with a disability" as a person who has "a

---

[9]   In addition to its arguments on the merits, discussed *infra*, the government contends, for the first time in a single sentence of its reply brief, that Freeman has failed to exhaust her administrative remedies because her failure to accommodate claim is still pending before the EEOC. The Court declines to grant summary judgment to the government based on one unsupported sentence in a reply brief; the present record is insufficient to support a holding for the government on that issue. Even though failure to exhaust administrative remedies is an affirmative defense, *Wilson v. MVM, Inc.*, 475 F.3d 166, 175 (3d Cir. 2007), the government never raised the defense in either its answer or its moving brief.

9

physical or mental impairment that substantially limits one or more of the major life activities of such individual."  29 U.S.C. § 705(20)(B)(incorporating by reference ADA's definition of "disability", 42 U.S.C. § 12102(2)).  The relevant regulations further provide that a physical impairment includes "any physiological disorder, or condition" affecting, *inter alia*, the "neurological," "musculoskeletal," or "cardiovascular" systems.  29 C.F.R. § 1630.2(h)(1).  "Major life activities means functions such as caring for oneself, performing manual tasks, walking . . . and working."  29 C.F.R. § 1630.2(i).  "Substantially limits means (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to . . . the average person in the general population. . ." 29 C.F.R. § 1630.2(j)(1).

Freeman asserts that she is wheelchair-bound and therefore obviously "disabled."  The record clearly supports a finding that Freeman was extremely limited in her ability to walk,[10] and a reasonable factfinder could conclude that her accident on the

---

[10]   Freeman testified that she never was able to walk during the time she was employed by the government.  She always used her wheelchair.  (Pl. Ex. Q at p. 384)

wheelchair ramp exacerbated her disability.[11]

The government asserts that no jury could reasonably conclude that Freeman was disabled because she testified that she was able to carry out all of her work tasks; she merely could not do them in the office five days a week.  Such an argument, however, conflicts with the government's principal argument that Freeman could not perform the essential function of her position, which, according to the government, is to be physically present in the office five days a week.

There is evidence in the record that would support a finding that Freeman had a physiological disorder (or disorders) that significantly restricted her ability to walk.  Accordingly, the Court concludes that a reasonable factfinder could conclude that Freeman was disabled during the relevant time period.

(2)  *Qualified individual*

A "qualified individual" is defined as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  The EEOC regulations divide this inquiry into two parts: (1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the

---

[11]   Karen Jost testified that before Freeman's access ramp accident, Freeman used a manual wheelchair, and after the accident she used a motorized wheelchair.  (Pl. Ex. Q at p. 42)

individual, with or without reasonable accommodation, can perform the essential functions of that position. 29 C.F.R. § 1630.2(m). The parties do not dispute the first prong of the inquiry.

"Whether a particular function is essential is a factual determination that must be made on a case by case basis based upon all relevant evidence." *Turner*, 440 F.3d at 612. A duty is an "essential function" of the job if it is "fundamental," and not "marginal," to the employment position. 29 C.F.R. § 1630.2(n)(1). "A job function may be considered essential for any of several reasons, including, but not limited to, the following:

> (i) The function may be essential because the reason the position exists is to perform that function;
>
> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>
> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Turner*, 440 F.3d at 612 (citing 29 C.F.R. § 1630.2(n)(2)). Evidence of whether a particular function is essential might include, but is not limited to:

> (i) The employer's judgment as to which functions are essential;
>
> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>
> (iii) The amount of time spent on the job

12

performing the function;

(iv) The consequences of not requiring the incumbent to perform the function;

(v) The terms of a collective bargaining agreement;

(vi) The work experience of past incumbents in the job; and/or

(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2 (n)(3).

The government asserts that it is entitled to summary judgment because being physically present in the office five days a week is an essential function of the Security Assistant position, therefore Freeman, who could only work three days a week in the office, was not a qualified individual. However, the record evidence could lead a reasonable factfinder to conclude that being physically present in the office was not an essential function of the job.

Liu testified that five-day a week office presence was essential so that Freeman would always be available for face-to-face interactions with FAMs who necessarily came to the office for short periods of time, at irregular times during the week, due to their varying travel schedules. (Pl. Ex. Q at p. 260, 266) But Joseph Costello, who supervises the FAMs, testified that in four years he has "never experienced" a situation where one of his FAMs needed to meet with a Security Assistant face-to-

face.  (Id. at p. 351)[12]  Costello explained, "[b]ecause of their schedules, a lot of [FAMs'] [administrative] issues are resolved over e-mail or telephone.  These guys are not in the office often."  (Id.)  Also, Freeman's indirect supervisor, Karen Jost,[13] generally agreed that it was possible for FAMs to communicate with Freeman directly by telephone, email and fax. (Id. at p. 111)

The Court is generally reluctant to interfere with an employer's determination as to the duties the employer considers essential to any given position.  But the government's own employee testified that physical office presence five days a week was not necessary, thereby creating an issue of fact as to the essential functions of Freeman's position, which is better determined by a jury.

(3)  *Reasonable accommodation and undue hardship*

The Rehabilitation Act requires employers to make reasonable accommodations for disabled, qualified individuals, unless the employer can show that the reasonable accommodation would "impose an undue hardship on the operation of the [employer's] business."

---

[12]  (*See also* Pl. Ex. Q at p. 368)(Testimony of Security Assistant Harry Jessen: "Q: Can you think of an instance where a [FAM] has an issue to deal with– an issue that can only be dealt with on a face-to-face basis?  A: I can't really.")

[13]  The record is somewhat unclear as to Jost's official authority over Freeman.  It is undisputed that Freeman's direct supervisor was Tom Spurlock. However, Jost, who seems to hold a position analogous to an office manager, and is clearly more senior than Freeman, had some supervisory authority over the administrative staff, and collaborated with Spurlock regarding Freeman's medical leave and proposed accommodations.

14

42 U.S.C. § 12112(b)(5)(a). "Reasonable accommodation" means measures such as "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

"In deciding whether a genuine issue of material fact exists regarding the reasonableness of the requested accommodation, [the plaintiff must first make] a facial showing that her proposed accommodation is possible." *Turner,* 440 F.3d at 614. If the plaintiff satisfies this burden of production, the employer must "prove, as an affirmative defense, that the [requested accommodations] are unreasonable, or would cause undue hardship on the employer." *Id.*

The government argues that Freeman's proposed accommodation, teleworking two days a week, is not possible because of limited off-site access to the government's computer network and security concerns. However, disputed issues of fact preclude summary judgment for the government on this issue. The government's asserted reasons for why teleworking would not be possible merely suggest that teleworking from home *full-time* would not be possible. However, Freeman proposes teleworking only 40% of the time (i.e., 2 out of 5 days). Karen Jost testified that Security Assistants can work on travel vouchers at home through the

internet,[14] and she also testified that processing travel
vouchers consumes about 40% of a Security Assistant's time. (Pl.
Ex. Q at p. 18, 28, 86)  Thus, a factfinder might reasonably find
that Freeman could process vouchers on the two days she
teleworked.

     The Court reaches this conclusion even though the government
asserts, and Freeman does not dispute, that the supporting hard-
copy documentation required to process the vouchers (e.g.,
lodging and meal receipts) contains "sensitive" information--
namely, the identities of FAMs (including Social Security
numbers) and where the FAMs have flown.[15]  According to the
government, that information must not leave the Philadelphia
field office, so as to keep the information secure.  Thus, the
government reasons, it is not possible to process vouchers from
outside the office.

     On this record, a reasonable factfinder could conclude that
the security of that information would not be compromised by

_____

     [14]  Freeman also testified that she could process vouchers from home
because the program used to process vouchers was accessible through the Web
using a password.  (Pl. Ex. Q at p. 407-08)

     [15]  The record does raise a question about the relative sensitivity of
the information contained in the vouchers and supporting documentation.  For
example, a travel voucher and supporting documents will indicate that John Q.
Smith, with a Social Security number of xxx-xx-xxx, stayed at the Atlanta
Hilton on March 2, 2002, but nothing in the documentation would necessarily
indicate that John Q. Smith was a FAM. (See Pl. Ex. Q at p. 355-56) ("if you
took a travel voucher, and you laid it on a table in a public place, I don't
think anyone could decipher that that person . . . I don't think anything on
it discloses that individual is a Federal Air Marshal.") Additionally, it is
undisputed that travel vouchers are produced for travel that has already taken
place.  However, the Court will assume for purposes of this Motion, that the
personal and travel information in the documents is nonetheless sensitive.

allowing Freeman to take the documents home.  First, it is undisputed that Jost has taken home documents containing such sensitive information. (Id. at p. 119-20, 135, 426).  Moreover, Jost testified that there is no policy on the safekeeping of documents (Pl. Ex. Q at p. 100) and the documents carry no official security designation such as "secret," "top secret," "classified," or "law enforcement sensitive."  (Id. at p. 99) The documents are not physically secured in any way while they are in the Philadelphia field office.  (Id. at p. 100-01, 426) Lastly, it is undisputed that the sensitive information originates from outside the Philadelphia field office because the vouchers and travel receipts are completed by FAMs in the field.[16]  According to Freeman, the documents would be just as secure in her home.[17]  (Id. at 425-26)  These facts are sufficient to raise a jury question as to whether security needs would prevent Freeman from teleworking.[18]

---

[16]   Jost testified that FAMs could fax their vouchers to the Philadelphia field office from places like a hotel or a Staples store.  (Pl. Ex. Q at p. 101-02)

[17]   Freeman testified that no other people would have access to her home workspace.  (Pl. Ex. Q at p. 433)  Although not entirely clear, the record suggests Freeman lives alone.  She is a widow and testified that her adult son does not live with her.  (Id. at p. 434)

[18]   The government also suggests that security concerns would prevent Freeman in particular from teleworking because, according to the government, she had been careless with documents in the past.  Disputed issues of fact preclude summary judgment for the government on this issue as well.  It is undisputed that Freeman was never disciplined for misplacing documents and Jost testified that she believed Freeman to be a competent Security Assistant who was "not sloppy" and "not incapable of handling documents as a Security Assistant."  (Pl. Ex. Q at p. 62-63, 66-67)  Additionally, no FAMs ever complained about Freeman's performance, except to call her the "'travel

In further support of its contention that teleworking two
days a week is not possible, the government asserts that payroll,
which is undisputedly Freeman's most time-sensitive and time-
consuming duty, cannot be performed outside of the office because
the computer programs used to process payroll were not accessible
from a remote location.  Even if the Court assumes, however, that
it was not possible to create the necessary network connections
for Freeman,[19] disputed issues of fact preclude a finding that
teleworking two days a week would not be possible.  It is
undisputed that payroll is processed weekly on Mondays and
Tuesdays.  Freeman testified that she could arrange her schedule
to be present in the office on Mondays and Tuesdays, and had done
so in the past.  (Pl. Ex. Q at p. 408)  Thus, a reasonable
factfinder could reconcile the asserted need for Freeman to be
physically present in the office on Mondays and Tuesdays with her
proposed teleworking accommodation.

In sum, the record viewed as a whole, could reasonably
support the conclusion that Freeman could be physically present
in the office on Mondays and Tuesdays to process payroll and
telework from home processing vouchers two days later in the
week.  Such an arrangement would still leave one other in-office

---

voucher Nazi'" because she wanted to make sure the vouchers were done
correctly.  (Id. at p. 345, 349-50)

[19]   Joseph Costello, Assistant to the Special Agent in Charge, testified
that Freeman would generally be able to "perform her duties as a security
assistant" from home if she had "the proper equipment."  (Pl. Ex. Q at p. 347)

day to complete the other 10-20% of her duties.[20]  Moreover, a
jury question exists as to whether the documents Freeman would
need to take home would be sufficiently secure.  Thus, the Court
holds that a reasonable factfinder could conclude that
teleworking two days a week is possible.

Disputed issues of fact also exist as to whether Freeman's
proposed accommodation would create an undue hardship on the
government.  "'Undue hardship' means an action requiring
significant difficulty or expense, when considered in light of":

(i) the nature and cost of the accommodation needed
under this Act;

(ii) the overall financial resources of the facility
or facilities involved in the provision of the
reasonable accommodation; the number of persons
employed at such facility; the effect on expenses
and resources, or the impact otherwise of such
accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered
entity; the overall size of the business of a
covered entity with respect to the number of its
employees; the number, type, and location of its
facilities; and

(iv) the type of operation or operations of the
covered entity, including the composition,
structure, and functions of the workforce of such
entity . . . .

42 U.S.C. § 12111(10).

As noted above, undue hardship is an affirmative defense,
yet the government has provided very little probative evidence

---

[20]  More generally, Freeman's co-worker, Security Assistants Harry
Jessen, testified that given the right equipment, Freeman could have done "90%
or more" of her duties from home.  (Pl. Ex. Q. At p. 367)

19

relating to the factors just listed.  Moreover, if Freeman did process vouchers at home on the two days she teleworked, a reasonable factfinder might conclude, at least on the present record, that the government would suffer no hardship, or at least conclude that any hardship did not rise to the level of "significant difficulty."  42 U.S.C. § 12111(10).  Freeman testified that she already had web access to the program for processing vouchers, (Pl. Ex. Q at p. 407-08), thus there would be no cost (in either time or money) associated with enabling Freeman access to the program at home.  While Jost testified that other people present in the office would need to fax supporting documentation for the vouchers to Freeman's home, (Id. at p. 25, 82), this evidence alone is insufficient to grant summary judgment to the government on the issue of undue hardship.

(4)  *Failure to engage in the interactive process*

Freeman also asserts that the government failed to engage in the interactive process of determining whether her request to telework was a reasonable accommodation.

The ADA's regulations and interpretive guidelines (incorporated into the Rehabilitation Act) provide:

> To determine the appropriate reasonable accommodation it may be necessary for the [employer] to initiate an informal, interactive process with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations.

20

29 C.F.R. § 1630.2(o)(3).

> Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability.

29 C.F.R. Pt. 1630, App. § 1630.9 at 359. "Both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 312 (3d Cir. 1999).

> [C]ourts should look for the signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in good faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Id.*

The record, viewed in the light most favorable to Freeman, could support the conclusion that the government acted in bad faith in response to Freeman's request for accommodation. A reasonable factfinder could find that all of Freeman's verbal requests for accommodation were dismissed out-of-hand merely because no teleworking policy existed. Even after Freeman retained an attorney, who requested an accommodation in writing, Freeman received no response, despite a follow-up letter asking

21

for a response.  (Pl. Ex. B)  The government finally responded, notifying Freeman of its intention to remove her from her job. Only after the government explained the reasons for Freeman's proposed removal, did it then address why Freeman's proposed accommodation was unreasonable.  These facts could support a finding of the government's bad faith.  Accordingly, summary judgment will be denied.


B.   The retaliation claim

     The government also moves for summary judgment on Freeman's claim that she was removed from her position because she sought EEO counseling and ultimately filed an EEO complaint.

> To establish a prima facie case of retaliation under the [Rehabilitation Act], a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action . . . . If an employee establishes a prima facie case . . . the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action . . . . If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.

*Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997) (internal citations and quotations omitted); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-06 (1973).

     The government only attacks the third prong of Freeman's

prima facie case, asserting that no reasonable factfinder could find a causal link between Freeman's EEO complaint and her removal.  The government argues that the uncontroverted record evidence shows that the draft of Freeman's notice of proposed removal was begun in "late August [2004]," (Pl. Ex. Q at p. 226), yet Freeman's formal request for accommodation, which referenced her intention to seek EEO counseling, is dated September 1, 2004. The government reasons that no factfinder could find causation because the "removal process" began before Freeman engaged in any protected activity.

The government's argument, however, misses the mark because the adverse employment action at issue is Freeman's actual termination, not the initial steps taken towards that end.  As a conceptual matter, a finding that Freeman's removal was first contemplated before her EEO activity does not logically preclude a finding that the ultimate decision to go ahead with the termination was motivated by retaliatory animus.  Accordingly, the government's argument fails.

As the government has made no other arguments in support of its motion on the retaliation claim, summary judgment will be denied.[21]

---

[21] Alternatively, a reasonable factfinder could find that Freeman has established all of the elements of her prima facie case and pretext.  Seeking EEO counseling and filing an EEO complaint are obviously protected activities, *see* 42 U.S.C. § 12203; and removing Freeman from her position is an adverse employment action, *see Speer v. Norfolk S. Ry. Corp.,* 121 Fed. App'x 475, 477 (3d Cir. 2005).  While the government asserts that Freeman was terminated

C.    The challenge to Freeman's removal

Freeman's complaint asserts no independent request for judicial review of the government's decision to remove her.[22] Her claim is that the government removed her for discriminatory and retaliatory motives; as such, the challenge to Freeman's removal merges with the claims discussed *supra*, and the government's motion for summary judgment must be denied.


**IV.**

For the reasons sated above, the government's motion will be denied.   An appropriate order will be issued.


Date: March 30, 2009

                              s/ Joseph E. Irenas
                         _____
                         JOSEPH E. IRENAS, S.U.S.D.J.


---

because she could not be physically present in the office five days a week, for the reasons discussed *supra*, a reasonable factfinder could conclude that five-day a week physical presence in the office was not an essential function of Freeman's job, therefore a reasonable factfinder could also conclude that the government's justification for Freeman's removal (her inability to be in the office five days a week) was pretextual.  Lastly, the evidence of pretext, along with the close temporal proximity of Freeman's removal and her requests to telework, are sufficient facts from which a reasonable factfinder could find causation.

[22]  For example, Freeman does not assert that the decision to remove her was arbitrary, or not in compliance with lawful procedures.  *See* 5 U.S.C. § 7703(c).